213 P.3d 948 (2009)
QUALCOMM, INCORPORATED, Appellant,
v.
STATE of Washington, DEPARTMENT OF REVENUE, Respondent.
No. 37718-7-II.
Court of Appeals of Washington, Division 2.
August 25, 2009.
Michele G. Radosevich, Garry George Fujita, Davis Wright Tremaine LLP, Seattle, WA, for Appellant.
*949 Brett S. Durbin, Cameron Gordon Comfort, Atty. General's Office, Revenue Division, Olympia, WA, for Respondent.
HOUGHTON, P.J.
¶ 1 Qualcomm, Incorporated, appeals the trial court's summary judgment order dismissing its tax refund claim. It argues that the Department of Revenue (DOR) improperly taxes its truck tracking service as a "network telephone service" rather than at the business and occupations (B & O) tax service rate. We disagree and affirm.

FACTS
¶ 2 Qualcomm sells the OmniTRACS Mobile Communications System (OmniTRACS system or system) to trucking companies to assist them with tracking and managing vehicles. To use Qualcomm's OmniTRACS system, a customer needs three components: (1) mobile communication terminals in its trucks and other truck hardware; (2) system software, installed at the trucking dispatch center; and (3) the OmniTRACS service (tracking service), which allows the customer's dispatch center to locate and communicate with individual trucks.
¶ 3 The customer purchases from Qualcomm the hardware, such as sensors and mobile communication terminals, and the software and licenses to use the software, such as the programs used in a trucking company's dispatch center. The taxation of these items is not the subject of this appeal.
¶ 4 A customer may purchase one of two system tracking service plans. The Base Plan costs $35 per month. This plan includes one automatic position poll per hour, which informs trucking company's dispatch centers of the truck's location. It creates an automatic position poll when the truck's mobile communication terminal sends a signal via two satellites to Qualcomm's network management center.
¶ 5 Qualcomm's network management center converts the raw information sent by the truck's mobile communication terminals to Qualcomm's satellites into location, time, and date information, readable by the system software at the customer's dispatch center. Qualcomm's system can also use a global positioning system (GPS) to calculate a truck's location, but fewer than 10 percent of "all units on air" use GPS. Clerk's Papers (CP) at 112.
¶ 6 The position poll data resides in Qualcomm's network management center computers. To receive automatic position polls, the customer must log into Qualcomm's network management center. The customer must do so via landline or Internet from its own computer in its own dispatch center.
¶ 7 Qualcomm's Enhanced Plan costs $50 per month and includes the Base Plan plus 180 messages and 18,000 characters per month. The Enhanced Plan groups messages into three categories: macro messages, freeform messages, and SensorTRACS.
¶ 8 Macro messages comprise the bulk of messages sent. These messages consist of a template stored at both the customer's dispatch center and in a customer's mobile communication terminal in the customer's truck. The customer determines the information contained in its template.
¶ 9 To send a macro message to a truck, the customer's dispatch center uses a "fill in the blank" template and transmits the information to a truck's mobile communication terminal via Qualcomm's network management center. CP at 30. Information from the truck can also be filled in on the template to transmit information to the customer's dispatch center via Qualcomm's network management center. A customer can integrate the macro data into its own computer system to create, for example, invoices for delivered goods.
¶ 10 Either the customer's truck driver or the customer's dispatch center employee drafts freeform messages, like the macro messages, transmissible via Qualcomm's network management center. These messages most resemble email messages, but like all other data, Qualcomm's network management center stores the customer's messages accessible by the customer's dispatch center. For example, Qualcomm's system assigns a tracking number to messages sent from a customer's truck. The customer's dispatch *950 center then references this number to access the truck's freeform message.
¶ 11 The customer's dispatch center sends an automatic confirmation to Qualcomm's network management center. Freeform messages include additional data that Qualcomm's network management center can use to calculate the position of a truck's mobile communication terminal sending the message and "provide information on the signal strength of the satellite communications link between the mobile unit and the satellite." Appellant's Br. at 7.
¶ 12 The SensorTRACS messages consist of information collected by a customer's mobile communication terminal from sensors on a truck and transmitted via Qualcomm's network management center to the customer's dispatch center. The Qualcomm software at the customer's dispatch center receives the information from Qualcomm's network management center and allows a customer to use the raw information to monitor truck driver performance, engine information, and location.
¶ 13 Between 1998 and 2001, the period at issue here, Qualcomm paid B & O taxes at a lower service rate. After an audit, DOR assessed Qualcomm $900,573 for uncollected retail sales tax, retailing B & O tax, and interest, based on its assumption that the tracking portion of Qualcomm's system is a "network telephone service," as defined by former RCW 82.04.065(2) (2002) (amended in 2002, 2007, 2009).
¶ 14 Qualcomm appealed to DOR's appeals division, which rejected the appeal and sustained the tax. Qualcomm paid the taxes and filed a superior court action seeking a refund. RCW 82.32.180. On cross motions for summary judgment, the trial court granted DOR's motion and denied Qualcomm's. Qualcomm appeals.

ANALYSIS
¶ 15 Qualcomm first contends that the trial court erred in granting summary judgment to DOR. It argues that DOR incorrectly determined that Qualcomm's tracking service is taxable as a "network telephone service" as defined in former RCW 82.04.065.

Standard of Review
¶ 16 We review summary judgment orders de novo. Qwest Corp. v. City of Bellevue, 161 Wash.2d 353, 358, 166 P.3d 667 (2007). A trial court properly grants a motion for summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c).
¶ 17 We resolve this matter by interpreting the statute DOR used to tax the OmniTRACS system. We review the meaning of a statute de novo as a question of law. Delyria v. State, 165 Wash.2d 559, 562, 199 P.3d 980 (2009). We must ascertain and carry out the legislature's intent. Delyria, 165 Wash.2d at 563, 199 P.3d 980. Where plain on its face, we give effect to a statute's language as an expression of legislative intent. Delyria, 165 Wash.2d at 563, 199 P.3d 980. We determine the plain meaning of a statutory provision based on the statutory language but, where necessary, we may look to the context of related statutes that disclose legislative intent. Delyria, 165 Wash.2d at 563, 199 P.3d 980. Where the statutory language is clear, we end our inquiry. Delyria, 165 Wash.2d at 563, 199 P.3d 980. If after this inquiry the statute remains susceptible to more than one reasonable meaning, the statute is ambiguous and we may resort to statutory construction aids, including legislative history. Delyria, 165 Wash.2d at 563, 199 P.3d 980. We construe taxation statute ambiguities against the state and in favor of the taxpayer. Qwest, 161 Wash.2d at 364, 166 P.3d 667.
¶ 18 According to DOR, Qualcomm provided "network telephone service" as defined by former RCW 82.04.065, requiring it to be taxed at that rate. The relevant portion of this statute provides:
"Network telephone service" means the providing by any person of access to a local telephone network, local telephone network switching service, toll service, or coin telephone services, or the providing of telephonic, video, data, or similar communication or transmission for hire, via a local telephone network, toll line or channel, *951 cable, microwave,[[1]] or similar communication or transmission system.
Former RCW 82.04.065(2) (emphases added).
¶ 19 In 2007, the legislature amended RCW 82.04.065 to replace the phrase "network telephone service" with "telecommunications service." Laws of 2007, ch. 6, § 1002(8). The legislature enacted the changes to update terminology, not to change current taxability law. S.B. Rep. 5089, at 3 (Final Bill Report, effective July 22, 2007).
¶ 20 In the new law, "telecommunications service" expressly excludes
[d]ata processing and information services that allow data to be generated, acquired, stored, processed, or retrieved and delivered by an electronic transmission to a purchaser where such purchaser's primary purpose for the underlying transaction is the processed data or information.

Laws of 2007, ch. 6, § 1002(8)(a) (emphasis added) (codified as RCW 82.04.065(8)(a)).[2]
¶ 21 The parties dispute the proper method of analysis. We must first decide the correct method for analyzing the statutory language.

Plain Language and Proper Method of Analysis
¶ 22 Qualcomm contends that the plain language of the "network telephone service" definition covers only "pure transmission transporting voice and data messages from one point to anothernot on generating or processing the content of those messages." Appellant's Br. at 12. Hence, it argues that because its system involves data processing, DOR cannot tax the system as a telephone service even if it also transmits the processed data.
¶ 23 Qualcomm cites two cases to support its argument, but neither applies here. In Western Telepage, Inc. v. City of Tacoma, 140 Wash.2d 599, 998 P.2d 884 (2000), our Supreme Court addressed taxation of a pager service. Qualcomm argues that Western Telepage determined that former RCW 82.04.065 unambiguously includes "data transmitted by microwave" but not data processing. 140 Wash.2d at 612, 998 P.2d 884. Western Telepage confirms that this statute covers data transmission. 140 Wash.2d at 612, 998 P.2d 884. But it does not address a situation like Qualcomm's, which involves both data transmission and processing.
¶ 24 Qualcomm also relies on Community Telecable of Seattle, Inc. v. City of Seattle, 164 Wash.2d 35, 186 P.3d 1032 (2008). Qualcomm asserts that this case shows that any data manipulation removes a service from the definition of a "network telephone service." Resp't's Br. at 14. DOR counters that Community Telecable is irrelevant because it addresses Internet service, which is expressly excluded from the definition of "network telephone service." Resp't's Br. at 16.
¶ 25 In Community Telecable, the city sought to tax Comcast under former RCW 82.04.065 because a portion of its activities included data transmission. 164 Wash.2d at 42, 186 P.3d 1032. The court rejected this argument, noting that "[t]he transmission component of Internet service cannot be separated from the actual service." Community Telecable, 164 Wash.2d at 44, 186 P.3d 1032.
¶ 26 Had the Community Telecable analysis stopped here, DOR's argument that the case limits its analysis to Internet services would have merit. The court, however, continued:

Moreover, the record reflects that Comcast "transforms" and "manipulates" data as it passes through the Comcast network; this manipulation is an integral and necessary part of the provision of Internet services. Even where Comcast passes on data to another entity, such as At Home Corporation, that passed data would not be useful unless Comcast had transformed the data along the way. Therefore, Comcast is not engaging in the mere "provision of transmission" under RCW 82.04.065(2). Comcast's cable Internet service is plainly *952 excluded from the statutory definition of "network telephone service" under RCW 82.04.065(2).
164 Wash.2d at 44, 186 P.3d 1032 (emphases added) (citations omitted).
¶ 27 Community Telecable clearly indicates that where transmission is required to provide an excluded service, such as Internet service or data or information processing, the data "transmission component ... cannot be taxed separately" from data processing services. 164 Wash.2d at 45, 186 P.3d 1032. Although the case mentions the "mere `provision of transmission' under RCW 82.04.065(2)," it also concludes that the manipulation of data must be "an integral and necessary part of" the excluded service. Community Telecable, 164 Wash.2d at 44, 186 P.3d 1032. Consequently, Community Telecable also does not support Qualcomm's position that any data transformation automatically removes a service from the definition of "network telephone service."
¶ 28 More notably, the "integral and necessary" language of Community Telecable favors DOR's analysis: determining the "primary purpose" or "true object" of the hybrid activity. The 2007 amendment of RCW 82.04.065(8)(a) also supports this test by referencing the purchaser's "primary purpose for the underlying transaction." Former RCW 82.04.065 (2007).[3]
¶ 29 Before reaching the "primary purpose" test, we must first address DOR's initial position that Qualcomm's tracking service (either the Base Plan or the Enhanced Plan) involves data transmission only and is taxable under former RCW 82.04.065. That is, DOR argues that the Qualcomm's system's sole purpose is data transmission. We disagree.
¶ 30 DOR cites Western Telepage for the proposition that data transmission can include (1) one-way transmission of data (as opposed to two-way communication, such as a telephone call); (2) data transmission not done in "real-time"; and (3) data transmission occurring on a "store and forward" basis, where information is stored at a central location before being forwarded to a recipient. Resp't's Br. at 11. All three statements are correct; Western Telepage confirmed that a one-way paging system, where messages are routed through a central location and not delivered in real time, is taxable as "network telephone service." 140 Wash.2d at 602, 609-12, 998 P.2d 884
¶ 31 Western Telepage, however, primarily addressed whether one-way transmission falls within the statute. Neither party took the position that the pager service manipulated or transformed the data it was transmitting.
¶ 32 In contrast here, DOR acknowledges that Qualcomm engages in some processing of data, although it disputes the extent of the processing.[4] Specifically, DOR states that the tracking service "process[es] the raw position information coming from the trucks." Resp't's Br. at 3. Therefore, we must reach the issue whether the primary purpose of the service is data transmission or data processing.
In general, with a contract not subject to bifurcation,[[5]] the Department looks to the "primary activity" (Det. No. 92-183ER, 13 *953 WTD 96 (1993)) or the "predominate nature" (Det. No. 91-163, 11 WTD 203 (1991)) of the activities to determine the B & O tax classification of the income. See generally Det. No. 98-012, 17 WTD 247 (1998). The test has also been characterized as a "true object" test. Wash. Dep't of Revenue, Determination No. 03-170, 24 Wash. Tax Dec. 393, 396 (2005). Thus, we turn to discussing the primary purpose or true object test as the basis of our analysis.

Primary Purpose/True Object Test
¶ 33 The determination of a contract's true objective focuses on what the purchaser seeks to obtain from the seller. Determination No. 03-170, 24 Wash. Tax Dec. at 396; see also Wash. Dep't of Revenue, Determination No. 89-009A, 12 Wash. Tax Dec. 1, 5 (1993). If we were to determine that the data transmission portion of the tracking service was "merely incidental to the information services" portion, Qualcomm should not be taxed for providing "network telephone service." Wash. Dep't of Revenue, Determination No. 98-202, 19 Wash. Tax Dec. 771, 776 (2000) (quoting Wash. Dep't of Revenue, Determination 90-128, 9 Wash. Tax Dec. 280-1 (1990)). The true object test may involve an examination of items such as the transaction contract, related billing, and advertising. Wash. Dep't of Revenue, Determination No. 90-128, at 5-6, 9 Wash. Tax Dec. 280-1 (1990); Wash. Dep't of Revenue, Determination No. 00-159E, 20 Wash. Tax Dec. 372, at 378-79 (2001).
¶ 34 Qualcomm relies heavily on a 2007 case from the Tennessee Court of Appeals. In Qualcomm, Inc. v. Chumley, No. M2006-01398-COA-R3-CV, 2007 WL 2827513, at *1 (Sept. 26, 2007), the Tennessee court determined that "telecommunications was not the true object or primary purpose of the" tracking service. The Tennessee Qualcomm court concluded:
Having thoroughly analyzed the facts as they were agreed upon by the parties before the trial court, we conclude that the true object or primary purpose of Qualcomm's OmniTRACS service is to determine the location and load status of customer vehicles-that is, to collect data and then make it available to Qualcomm's customers. While the OmniTRACS system undoubtedly contains the ability to transmit "free form" text messages, acquiring this capability is not the principal aim of its purchasers. Nor does the system's capacity for sending "macro" messages transform it into a telecommunications service since these so-called "messages" do little more than allow information concerning a vehicle's status to be combined with information on its location. Even then, these "macro" messages must still be retrieved by the customer. As agreed below, the ability to ascertain a vehicle's location and load status is the primary reason that customers purchase OmniTRACS. The fact that a service might employ, involve, or be accessed by telecommunications, without more, will not transform it into a taxable telecommunications service. See Prodigy [Servs. Corp. v. Johnson], 125 S.W.3d [413,] 419 [Tenn. Ct.App.2003]; see also Equifax [Check Servs., Inc. v. Johnson], 2000 WL 827963, at *3 [Tenn.App.2000].
2007 WL 2827513, at *8 (citations omitted).
¶ 35 The Tennessee case is distinguishable on its facts. There, the parties agreed that the system's purpose was to "collect data and then make it available to Qualcomm's customers." 2007 WL 2827513 at *8. We agree with DOR that this admission in the Tennessee case "improperly conflates the functionality of the OmniTRACS system with the function of the OmniTRACS Mobile Communications service." Resp't's Br. at 29. Thus, the Tennessee case does not apply here.[6]

*954 Primary PurposeTruck Location System/Automatic Position Polls
¶ 36 Returning to the question of the primary purpose here, we note that the tracking service provides a range of options, from the truck location and SensorTRACS systems, which least resemble a "means of person-to-person communication," Qualcomm, 2007 WL 2827513, at *8, to the freeform messages, which most resemble such communication. Consequently, if the basic truck location system qualifies as a "network telephone service," the true object of the tracking system as a whole will be taxable data transmission; Qualcomm's automatic position poll service forms the core of the Base Plan and, as stated, is not easily analogized to traditional telephone calls or other similar methods of communication.
¶ 37 Qualcomm accords great weight to the location data manipulation that takes place at its network management center. It asserts that "Qualcomm calculates the position of the truck using satellites and determines the condition of the truck by using data from sensors and the engine bus." Appellant's Reply Br. at 3. In support of its claim, Qualcomm cites two DOR determinations.
¶ 38 In the first DOR determination, an insurance claims processor that conveyed data between medical service providers and insurance carriers was not merely transmitting the data. This is because it also reformatted the information to facilitate the claims process and provided reports on the process for customers. Wash. Dep't of Revenue, Determination No. 05-0325, 27 Wash. Tax Dec. 99, 107 (2008).
¶ 39 In the second DOR determination, a travel agency leased a computer that gave it access to a database of hotel, airline, and rental car reservations. Determination No. 98-202, 19 Wash. Tax Determination at 773. The determination concluded that telephone line charges associated with the service were incidental to the data processing the reservation service rendered; "the furnishing of the telephone lines is not the object of the transaction, but merely incidental to the personal services being rendered." Determination No. 98-202, 19 Wash. Tax Dec. at 776 (quoting Wash. Dep't of Revenue No. 90-128).
¶ 40 DOR counters that "[n]othing in the record shows that the message data is converted or processed in any manner." Resp't's Br. at 22. It adds that any data processing performed at the network management center is done with the primary purpose of facilitating communication between the truck and the dispatch center. DOR also refers to various documents and advertising Qualcomm prepared for customers or prospective customers to support its argument that transmission, rather than data manipulation or processing, is the primary purpose of the tracking system. Notable among the advertising materials, according to Qualcomm, its OmniTRACS system is a "two-way, mobile satellite communications system," indicating its primary purpose or true objective of data transmission and not data manipulation. CP at 240. DOR's argument persuades us.
¶ 41 In both DOR determinations Qualcomm cites, the taxpayer performed a high degree of information processing in addition to data transmission. In the insurance case, for example, the taxpayer received information; reformatted it for use in insurance company electronic forms; requested additional information when needed to complete a claim form; and rejected claims based on certain guidelines, such as incomplete information, missed guidelines, or when a claim was from a pharmacy or insurance company that was not involved in the processing network. Determination No. 05-325, 27 Wash. Tax Dec. at 100-102.
¶ 42 In the travel reservations determination, the taxpayer used a telephone line to access a reservation system. The system "allow[ed] it to receive current information on airline, hotel, and rental car availability and prices ... [and] the reservation system allow[ed] Taxpayer to actually book the reservation with the service provider." Determination No. 98-202, 19 Wash. Tax Dec. at 775. The primary purpose, then, was to "access the information in the System's reservation system and to make the reservation." Determination No. 98-202, 19 Wash. Tax Dec. at 776.
*955 ¶ 43 The insurance determination sets out that the key issue here is whether the taxpayer provides "the medium over which the data was communicated," as opposed to "new information to its customers." Determination No. 05-0325, 27 Wash. Tax Dec. at 107. Using this standard, Qualcomm's tracking system, including the basic automatic position polls, falls within the definition of a "network telephone system" because Qualcomm provides the medium over which the customer's data is communicated and Qualcomm does not provide "new information to its customers."
¶ 44 Qualcomm's network management center does process the satellite data received from the customer's truck's mobile communication terminal and sensors to make this data useful to the customer's computer system, but this processing role is insufficient to amount to Qualcomm's "information processing" as discussed above. DOR's reconsideration determination for this matter noted that "[d]ata conversion and protocol conversions occur in most, if not all, communication systems. These conversions, in and of themselves, do not mandate that the service be deemed an `information service.'" CP at 15. The 2007 amendment of former RCW 82.04.065(8) supports this DOR determination:
"Telecommunications service" includes such transmission, conveyance, or routing in which computer processing applications are used to act on the form, code, or protocol of the content for purposes of transmission, conveyance, or routing....
(Emphasis added.)
¶ 45 Here, the record shows that the tracking service provides a communications link between the truck and its mobile communication terminal, owned by the customer, and the dispatch center's computers and tracking software, also owned by the customer. All of the data sent from the customer's truck to Qualcomm's network management center and retrieved by a customer's dispatch center is created by the customer's shipping activity, not by Qualcomm. The record simply does not suggest that Qualcomm manipulates the data in any relevant way.
¶ 46 Qualcomm's network management center converts raw data sent from the customer's truck/mobile communication terminal via satellites into a format that is usable by the customer's tracking software in the customer's dispatch center without providing significant new information to the customer's dispatch center. Determination No. 05-0325, 27 Wash. Tax Dec. at 107; see also former RCW 82.04.065(8) (recognizing that telecommunications, formerly network telephone service, includes some degree of computer processing to convey information). The circumstance here differs from the DOR insurance determination, for example, in which the taxpayer not only transmitted coverage information, but also followed up on missing information, checked for appropriate insurance coverage, and rejected certain claims, in addition to transmitting and reformatting collected data. Determination No. 05-0325, 27 Wash. Tax Dec. at 101-02.
¶ 47 Here, in contrast, the position poll reports and not the data manipulation required to create the reports, however obtained, motivate the customer to subscribe to the service. Our conclusion is supported by the fact that customers using the GPS method to locate trucks, instead of the proprietary Qualcomm satellite tracking method, pay the same amount for the tracking service as other customers, despite their position polls not needing the same level of data manipulation.
¶ 48 Finally, the reference to data manipulation in Community Telecable supports the trial court's order granting summary judgment to DOR. Because the position-tracking portion of the service qualifies as "network telephone service," the remaining services Qualcomm providesservices that both parties understand resemble more traditional methods of communicationto facilitate further information transmission between the truck driver and the customer's dispatch center also fall within the definition of "network telephone services." The trial court properly granted summary judgment.
¶ 49 Affirmed.
We concur: HUNT, J., and QUINN-BRINTNALL, J.
NOTES
[1] Satellites use microwave technology.
[2] Although not expressly stated, the parties agree that the distinction between data transmission and data and information processing preexisted the 2007 amendment.
[3] Qualcomm also relies on WAC 458-20-155, which provides that "[p]ersons who charge for providing information services or computer services" are subject to the service B & O tax, and that "this includes charges for ... on-line information and data." This regulation does not preclude applying a primary purpose or true object test to determine whether the "charges for .. . online information and data" form the primary purpose of the taxable income stream. See generally Det. No. 90-128, 9 WTD 280-1, at 4-5 (1990) (applying WAC 458-20-155 but also examining whether transmission function was "incidental" to processing service).
[4] The amount of data manipulation that takes place at Qualcomm's network management center and the reasons for the manipulation were contested before the trial court.
[5] DOR claims that even were we to determine that the location position poll reporting is not a "network telephone service," the macro and freeform messages are such a service. This analytical approach would require bifurcating the tracking service contract to address the messages and location services separately. Qualcomm correctly points out that the law disfavors bifurcation. Because we conclude that even the location service is taxable as a "network telephone service," we do not address the bifurcation issue in detail.
[6] Importantly, DOR notes that the Tennessee court appears to have a "more restrictive interpretation of the term `telecommunications' than the Washington Supreme Court." Resp't's Br. at 29. The final portion of the Tennessee court's Qualcomm opinion stresses that the court considers "telecommunications" to resemble telephone calls and similar services with direct interface between two parties. 2007 WL 2827513 at *8. In contrast, Western Telepage demonstrates that our state defines "network telephone service" (now "telecommunications") more broadly and does not need to be a direct, real-time interface. 140 Wash.2d at 611-12, 998 P.2d 884.